[Cite as *State v. Turpin*, 2017-Ohio-4200.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO.   27064 |
| | : | |
| v. | : | T.C. NO. 13CR90 |
| | : | |
| CRAIG E. TURPIN | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 9th day of June, 2017.

. . . . . . . . . .

LYNNE R. NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

J. ALLEN WILMES, Atty. Reg. No. 0012093, 7821 N. Dixie Drive, Dayton, Ohio 45414
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1}  Craig Turpin was found guilty by a jury and sentenced by the Montgomery County Court of Common Pleas on two counts of rape of a child under the age of 10 and one count of gross sexual imposition of a child under the age of 13; the trial court also found Turpin to be a sexually violent predator.   He was sentenced to "a total of life without the possibility of parole consecutive to a term of 5 years to life."   Turpin appeals from his conviction.

{¶ 2}  For the following reasons, the judgment of the trial court will be affirmed.

## I.    Procedural History

{¶ 3}  On January 14, 2013, Turpin was indicted on three counts of rape of a child under the age of ten (with sexually violent predator specifications), two counts of gross sexual imposition involving a child under the age of 13 (with sexually violent predator specifications), and one count of kidnapping (with sexual activity, sexually violent predator specification, and sexual motivation).   There were two alleged victims.   One count of rape of a child (Count VI) related to Turpin's daughter (H.H.); Counts I through V related to a neighbor's child (J.H.).

{¶ 4} Turpin filed numerous pretrial motions.   He filed a motion to dismiss or to sever the single count related to H.H. from the counts related to J.H.; the trial court overruled the motion to dismiss but sustained the motion to sever.   Turpin also filed motions to determine J.H.'s competency to testify and to bifurcate the sexually violent predator specifications from Counts I through V, both of which were sustained.

{¶ 5}  Turpin's trial was set for October 29, 2013.  On October 28, he entered guilty pleas to two counts in exchange for the dismissal of other counts.   However, on

November 21, 2013, prior to sentencing, Turpin filed a motion to withdraw his guilty pleas. Following a hearing, the trial court sustained Turpin's motion.

{¶ 6}  In February 2015, Turpin was tried by a jury on the charges against him related to J.H.; at Turpin's request, the sexually violent predator specifications were tried separately by the court.   The evidence presented at trial will be discussed below.   Turpin was found guilty of two counts of rape of a person under the age of 10, one count of gross sexual imposition under the age of 13, and one count of kidnapping (for the purpose of engaging in sexual activity) (Counts I, II, III, and V).   Turpin was found not guilty of gross sexual imposition, as charged in Count IV.   Count VI, the severed charge of rape of a different victim (H.H.), was dismissed without prejudice.   Following a bench trial, Turpin was also found to be a sexually violent predator.

{¶ 7}   The court merged Counts II and V (rape and kidnapping, respectively), and sentenced Turpin on Count II.   Turpin was sentenced to mandatory life without parole for each count of rape, and to five years to life on the gross sexual imposition, to be served consecutively.

{¶ 8}  Turpin raises two assignments of error on appeal, which assert that the trial court erred in allowing the testimony of H.H., a second alleged child-victim of Turpin, during the bench trial about Turpin's sexually violent predator classification, and that his convictions were against the manifest weight of the evidence.   The consideration of a sexually violent predator specification follows a defendant's conviction on the offense for which the specification is included.   *See* R.C. 2971.02.   Therefore, we begin with Turpin's argument that his convictions were against the manifest weight of the evidence.

## II.   The Weight of the Evidence

*A. Rapes, Gross Sexual Imposition, and Kidnapping*

{¶ 9} In his second assignment of error, Turpin contends that his convictions were against the manifest weight of the evidence because of the absence of DNA evidence, the absence of signs of physical penetration, the victim's failure to contract a sexually transmitted disease with which Turpin was diagnosed shortly after the victim's disclosure, and the victim's lack of credibility.

{¶ 10} When reviewing an argument challenging the weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 11} Turpin was charged with rape, gross sexual imposition, and kidnapping. For purposes of this case, rape is defined as engaging in sexual conduct with another who is not the spouse of the offender, when the other person is less than thirteen years of age, whether or not the offender knows the age of the other person. R.C. 2907.02(A)(1)(b). (A harsher sentence applies where, as in this case, the State proves that the victim was under the age of 10. R.C. 2907.02(B).) Gross sexual imposition is defined as having sexual contact with another, not the spouse of the offender, or causing another, not the spouse of the offender, to have sexual contact with the offender, when the other person is less than thirteen years of age, whether or not the offender knows the age of that person. R.C. 2907.05(A)(4). Kidnapping is removing another from the place

where the other person is found or restraining the liberty of the other person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, for the purpose of engaging in sexual activity with the victim against the victim's will.   R.C. 2905.01(A)(4).

{¶ 12}   The State presented the following evidence at trial:

{¶ 13}   J.H. (the victim), her mother, and her two older brothers (ages 11 and 16 at the time of trial) testified that they had lived in a second-floor apartment in Dayton in late 2012.   Turpin, who was nicknamed "Cowboy," lived on the first floor of the same building.   Turpin had been friends with Mother's then-boyfriend, T., who also lived with the family.   Mother worked many second and third shifts as a nurse's aide, during which time the children were often watched by T.; T. and the children would sometimes "hang out" with Cowboy.   However, as of mid-November 2012, T. no longer lived in the apartment with J.H.'s family, the children were often left home alone, and the children began to spend more time with Cowboy.   They played on a Wii game system and watched movies in Cowboy's apartment.   Sometimes Turpin would send the boys to the store for candy or soft drinks, but J.H. usually was not allowed to go along.

{¶ 14}   On January 1, 2013, J.H. disclosed to Mother that "Cowboy" had touched her inappropriately; Mother confronted Turpin by text message, and he denied the allegation.   Mother did not immediately call the police.   She testified that she did not have a lot of details at that point, and that she had been through a similar disclosure as a child and did not want J.H. to go through the same unpleasant experience.   However, Mother called the police on January 4, 2013.   The assaults were alleged to have occurred between November 16, 2012, when T. stopped living with J.H.'s family, and

January 1, 2013.

{¶ 15} After the police responded to the family's apartment and collected preliminary information from J.H., J.H. was taken to Dayton Children's Hospital, where a sexual assault exam was conducted. Later that day, the police learned that Turpin was working as a painter at a car dealership in another county; they arranged to have him picked up and transported back to Dayton, whereupon Turpin consented to a search of his apartment and provided the police with a key. The police collected several items, including a blue and white comforter and a dark blue t-shirt, which J.H. had mentioned in her account of the offenses.

{¶ 16} J.H. was 10 years old at the time of trial and 8 years old at the time of the alleged sexual activity. In her trial testimony, she referred to Turpin's penis as his "thingamajigger," which she identified on an anatomical picture, and she referred to her own "private area between [her] legs" as her "cookie." J.H. testified that, in Cowboy's bedroom, Cowboy took her hand, put it on his "thingamajigger," and showed her how her hand had to go up and down. She testified that her clothes were on when she did this, but her hand was on Cowboy's skin, not his clothes, and "white stuff" came out of his "thingamajigger." She wiped the "white stuff" on the bedding or on someone's clothing, possibly a blue t-shirt. She identified a blue t-shirt recovered from Turpin's apartment as the shirt on which she believed she had wiped the "white stuff." Cowboy told J.H. "do not tell anyone," or she would get in trouble; he also threatened to burn down her house if she told. J.H. could not remember if this type of conduct had occurred one time or more than one time.

{¶ 17} J.H. also identified a picture she had drawn at CARE House (an advocacy

center for abused children), which depicted her and Cowboy; J.H. stated that the picture represented true events. In the picture, J.H. identified that she had tears on her face, her hands and feet were covered with blue or gray tape, and she could move her hands "only a little bit." J.H. was naked in the picture, and Cowboy was dressed. J.H. testified that Cowboy made her do "weird things" and touched her, but she could not remember what part of his body had touched her on this occasion.

{¶ 18} When questioned about how Cowboy would touch her, J.H. testified that he had touched her with his finger on the skin of and inside her "cookie." She also testified that Cowboy's "thingamajigger" had touched her "cookie" on the inside and outside. She testified that these activities had "hurt." J.H. estimated that there had been 15 incidents. She stated that most of the incidents occurred at Turpin's apartment, but one or two had occurred in her own apartment, where she had wiped the "white stuff" on her own clothes and sheets. She testified that both his "thingamajigger" and his finger had been outside and inside her "cookie." J.H. testified that she had never seen another man's "thingamajigger" and had never seen a movie where people did what Cowboy did to her.

{¶ 19} J.H.'s brothers and Turpin testified that Turpin's Wii was set up in the main room of his apartment, and the television they used to watch movies was in Turpin's bedroom. According to the brothers, J.H. would sometimes watch movies with Turpin in the bedroom while the boys played the Wii; at these times, the door to the bedroom would be "almost all the way closed," and the boys could not see what has happening or hear what was being said in the bedroom. The younger brother, D.H., recalled one time when all four of them were watching a movie in the bedroom; J.H. and Turpin were under the

covers, but the boys were not. Turpin was "rubbing [J.H.'s] stomach" under the blanket, and she had a "sad face" like she "just got done crying." Turpin said that J.H. had a stomach ache, but D.H. had not heard J.H. mention a stomach ache. Both boys testified, however, that J.H. did not appear to be afraid of or upset with Turpin, and they never saw J.H. undressed with Turpin. The boys often found the apartment door locked when they returned from trips to the store.

{¶ 20} A pediatric sexual assault nurse from Dayton Children's Hospital testified that part of the work she was trained to perform was to develop a "narrative" with the child-victim, so that potential areas of injury could be identified. According to the nurse, J.H. reported that Turpin "would touch inner parts on my privates" and made her touch his "privates" until white stuff came out; he would also try to put his privates into her privates, but it hurt and J.H. would cry. The nurse further testified that, when J.H. came to the hospital, it was not clear when the last sexual contact had occurred. She stated that a rape kit can generally collect biological evidence only within 72 hours of the contact; she completed the kit because of uncertainty about how long it had been since J.H.'s last contact with the perpetrator.

{¶ 21} The Children's Hospital emergency room physician testified that J.H. had not yet reached puberty at the time of the doctor's examination and that her hymen was normal for a pre-pubertal girl, but that there was some redness of two areas of J.H.'s hymen. The doctor testified that J.H.'s hymen was crescent-shaped with an opening, that digital penetration would have been possible through the opening, even though the hymen was intact, and that "the tip of a penis can penetrate" the hymen without leaving a mark or tear. J.H. complained to the doctor that she (J.H.) experienced some pain on

urination, and the doctor testified that this could be a result of recent sexual activity. J.H. did not have any sexually transmitted diseases, but the doctor testified that the pH in a girl's vagina before puberty is not very conducive to the transmission of sexually transmitted diseases such as chlamydia and gonorrhea. The doctor also noted scrapes on J.H.'s right forearm and left ankle during the course of the exam.

{¶ 22} Detective Elizabeth Alley of the Dayton Police Department interviewed J.H. at her apartment the night of the first police contact, and Alley and Officer Jerome Dix interviewed her at CARE House a few days later. Based on these interviews, evidence technicians collected a blue and white striped comforter, a blue t-shirt, and blue painter's tape in the course of two searches of Turpin's apartment, among other items. Dix testified that J.H. was "bubbly," outgoing and talkative when the topic was something other than the sexual abuse, but that J.H. was "closed off," reserved, scared, and embarrassed when they talked about her disclosure. Dix and Alley each testified that J.H.'s answers to their questions did not appear to have been coached.

{¶ 23} Two forensic scientists from the Miami Valley Regional Crime Lab testified about testing they had performed on items collected from Turpin's apartment and on J.H.'s sexual assault kit. Stains on Turpin's comforter and pillow shams tested positive for semen, but the non-sperm fraction contained a mixture (DNA from more than one person); as a result, the sample could not be matched to Turpin, but he also was not excluded. J.H. was not a contributor to that sample. The blue t-shirt tested positive for semen, but no additional testing was conducted, because DNA testing is not typically conducted on the suspect's own clothing. The sexual assault kit "failed to identify semen" on J.H.'s vaginal, rectal, or oral samples, her clothing, or her fingernail scrapings.

However, one of the scientists testified that the absence of such evidence was not surprising if the type of contact alleged was digital penetration, limited penile penetration, or hand stimulations.

{¶ 24} Turpin's parole officer testified that, according to the parole authority's records, Turpin had lived in the apartment in J.H.'s building in November and December 2012. He also testified that Turpin was not permitted to leave the state without prior notice and approval of the parole authority, and that no travel had been approved during November or December 2012.

{¶ 25} Turpin testified in his own defense at trial, and he called two additional witnesses. Turpin testified that he had not spent much time in his apartment in November and December 2012 because he was working on a lot of commercial painting projects at night and had gone to Indianapolis to visit his brother. He also testified that a few friends had stayed at his apartment with him during this period. Turpin denied that the blue t-shirt collected from his apartment by the police was his; he claimed it belonged to T. He also testified that Mother had been jealous of the time T. spent with Turpin and had repeatedly texted Turpin, threatening to call his parole officer. Turpin did not produce copies of those texts and could not explain why they were not on his phone, except to say that the phones had been in the possession of the police department for an extended time. Turpin testified that Mother had asked him to have sex a few times, and that he (Turpin) had not touched J.H. and was shocked by her testimony.

{¶ 26} Turpin also testified that he and Officer Dix had attended high school together and had not gotten along; Turpin stated that he still felt "animus" from Dix during the investigation, although they had not seen each other since high school. (Turpin was

age 46.) Turpin stated that J.H. and her brothers had only come to his apartment about 10 times, and that they had sometimes played with his blue painter's tape. He denied that J.H. ever stayed in his apartment with him without her brothers. Turpin further testified that J.H. had witnessed T. urinating with the door open, that she sometimes misbehaved at his apartment, and that he always locked the door to his apartment because of the high crime rate in the area.

{¶ 27} Turpin's brother testified that Turpin and Dix "had words" in high school 30 years earlier and that Turpin had visited him in Indiana in December 2012.

{¶ 28} A nurse at a "public health" sexually transmitted disease clinic testified that Turpin tested positive for nongonococcal urethritis (inflammation of the urethra) in a collection taken on January 17, 2013. She testified that such an infection had a "high probability" of being transmitted through sexual contact, although transmission was not "absolute."

{¶ 29} Based on the evidence presented at trial, the jury could have reasonably credited the State's evidence. The State presented explanations for the absence of DNA evidence and signs of physical penetration, and for J.H.'s failure to contract Turpin's sexually transmitted disease. Moreover, it was for the jury to weigh the credibility of the victim's testimony. Although she was a child, she was found to be competent to testify. She presented a coherent version of events and admitted when there were details she could not remember. J.H.'s brothers corroborated the circumstances under which the abuse was alleged to have occurred, and the police collected various items from Turpin's apartment that had been described by J.H. J.H.'s prior accounts of the abuse for purposes of medical treatment were consistent with her trial testimony, and some of the

physical findings (redness on her hymen and scratches on her arms and feet), though not definitive, were also consistent with her testimony. The jury did not clearly lose its way or create a manifest miscarriage of justice in finding Turpin guilty of the offenses that it did.

*B. Sexually Violent Predator*

**{¶ 30}** "Sexually violent predator" means a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses. R.C. 2971.01(H)(1). The trial court may consider any of the following factors as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses:

(a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more

victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

R.C. 2971.01(H)(2).

**{¶ 31}** The State called seven witnesses at the trial on the sexually violent predator specification.

**{¶ 32}** Fairborn Police Department Detective Grover Songer testified that, on March 7, 1997, the detective responded to a call of a man calling a woman over to his car near Baker Middle School and exposing his genitalia to her. The man was described as a tan white male wearing a cowboy hat and driving a black car. Songer knew that a man fitting the same description had exposed himself and masturbated in front of two teenagers a few days earlier near Fairborn High School. On March 7, Songer located a man matching this description; the man was exiting a tanning salon and approaching a black car. Songer stopped the man, and he was identified as Craig Turpin. According to Songer, Turpin admitted to his involvement in these incidents and felt badly about them. However, Turpin also claimed that he was a male stripper and that he had been engaging in "fluffing" at the time of these incidents, a practice during which a stripper masturbates to get an erection, then puts a "nylon" around his penis to make it appear larger. Turpin also told Songer that, as a stripper, he had lots of sex and needed to find new ways to "excite himself."

**{¶ 33}** On July 28, 1998, Det. Songer was involved in another case in which Turpin had been arrested. Officers who had been dispatched on a domestic violence call concluded, after their investigation, that Turpin had attempted to rape his girlfriend's

younger sister, who was 16. Songer was not present at Turpin's arrest, but he was the detective assigned to the case. Turpin denied any sexual contact, but stated that he had tried to change the clothing of the teen, who was intoxicated, because she had either urinated on herself or been urinated on by a dog. The teen, C.K., reported that Turpin had ejaculated on her shirt and chest, and DNA tests confirmed the presence of Turpin's semen. Turpin was indicted for attempted rape. Turpin left the state for more than a year but was eventually apprehended in Indiana. During the drive back to Ohio, Turpin told Det. Songer that the teen in question had started kissing him and "masturbating him," and that their encounter had been consensual. (C.K.'s version is described below.)

{¶ 34} Officer Jerome Klemmensen from the Moraine Police Department testified that he was working as a road patrol officer on August 15, 1997, when he was dispatched on a complaint of a child being lured to a vehicle. The child, age 7 or 8, had been stopped from going with the driver by a neighbor, who got the license plate number of the car; the driver had allegedly asked the child to help him find his "kitty" and to come to his trailer to see his pet raccoon. While he was collecting information from the witnesses, Klemmensen saw a car matching the description given by the witnesses and with the same plate; it was a stolen car, and, when Klemmensen stopped it, he identified Turpin as the driver. Turpin's 16-year-old girlfriend was also in the car (Turpin was then approximately 29.) Turpin was charged with criminal child enticement. Turpin was convicted of attempted child enticement.

{¶ 35} C.K., the younger sister of a woman who was dating Turpin in July 1998, testified that she visited her sister's apartment on July 28 and played a drinking game with Turpin and her sister. C.K. was age 16 at the time, and this was the first time she

had met Turpin. C.K. later went to sleep on the couch while Turpin and her sister slept in the bedroom. C.K. recalled being awoken during the night by Turpin, who claimed that the dog had urinated on C.K. and that she needed to move from the couch to the nearby sofa. C.K. testified that Turpin then "start[ed] touching me, touching my legs, touching my breasts," telling her to be quiet and kissing her. C.K. was upset; when she tried to get up, Turpin held her down with one arm and pulled her underwear down; his penis was exposed. C.K. put her hands between her legs "so he could not penetrate [her] at all," and Turpin masturbated and "ejaculated all over [her]." C.K. was crying and "told him to stop many times" during this incident. When he was finished, C.K. ran to the bathroom and locked herself inside.

{¶ 36} Turpin's banging on the bathroom door woke C.K.'s sister; C.K. allowed her sister into the bathroom, where she explained what had happened, and both women fled out the bathroom window. As they tried to drive away, Turpin threw himself onto the hood of the car, which is where the police found him when they arrived on the scene. C.K. testified that Turpin pled guilty as part of a plea agreement, but she was unsure of the charge(s) to which entered pleas.

{¶ 37} C.H., C.K.'s sister and Turpin's former girlfriend, testified that they dated for about six months when she was 22. (She was 39 at the time of trial.) C.H. partially corroborated C.K.'s story about the night of July 28, 1998: that C.K. and Turpin had been playing a drinking game, that she had found C.K locked in the bathroom, after which they fled out the window, and that Turpin tried to stop them by jumping on the hood of the car.

{¶ 38} C.H. also testified that, after this incident, Turpin had repeatedly beaten, choked, and raped her, and had required that she remain with him for extended periods

of time against her will as they moved from state to state. She became pregnant with her daughter, H.H., who was born in 2000, during this time, but Turpin did not allow her to get prenatal care because he did not want to be caught by the police. Shortly thereafter, C.H. married Turpin because she felt "threatened" and "had no choice." She eventually helped the police set up the "sting" that led to Turpin's arrest in Indiana for the offense against C.K. She obtained a divorce when Turpin went to prison for three years.

{¶ 39} C.H. further testified that, in June 2005, she had additional contact with the police about Turpin in relation to her daughter, H.H. Turpin's family had talked C.H. into allowing Turpin to visit with H.H. under their supervision, but after a weekend visit H.H. complained that she hurt "down there"; C.H. took H.H. to a hospital and another health care facility, but could not recall whether H.H. was examined. That was the last time Turpin had contact with H.H., and no charges were filed as a result of that incident. C.H. obtained a protection order against Turpin, which has remained in effect and been renewed repeatedly since that time.

{¶ 40} Michael Joy, Turpin's parole officer, testified that Turpin was supervised from 2004 until 2007, without being revoked, after he was released from a three-year sentence for attempted rape. In 2012, he was supervised again after he failed to register as a sex offender and served additional prison time. Turpin was arrested in January 2013 for rape in this case.

{¶ 41} Detective Alley also testified that, during her investigation of J.H.'s case, she learned of Turpin's arrest for public indecency in Fairborn. She stated that the account Turpin gave of that event in 2013 was inconsistent with the police report about the event; Turpin had claimed he was passing out fliers for his work as a stripper.

{¶ 42} H.H., age 15, Turpin's biological daughter, testified at the hearing; she had not had any contact with Turpin for many years. H.H. testified that, when she was four or five years old, Turpin had taken her into the bathroom at his mother's house, pulled his pants down, "sat on the toilet and told me to suck on his penis." She "kept on saying, no, because [she] was afraid he was going to Peter in [her] mouth." Turpin showed her what to do, and she put his penis in her mouth and moved her head "up and down." She felt "gross." Turpin threatened to kill H.H. and her mother if H.H. told anyone, and she did not remember how long she waited before she told her mother. According to H.H., this conduct occurred only one time that she remembered; she told her mother, who called the police.

{¶ 43} Turpin also testified on his own behalf at the sexually violent predator hearing. With respect to the charges of indecent exposure against him in 1997 and 1998, he stated that he worked as a stripper from approximately 1996 until 1998, performing at birthday and bachelorette parties as his primary source of income. He stated that he was passing out fliers for shows he was doing at bars in Fairborn; after being told by the city that he was not allowed to place the fliers on telephone or light poles, he "started personally just pulling up and handing them to random people" and putting them in tanning salons. He stated that he was wearing pants with Velcro on the sides, so that they could be ripped off, that the Velcro was undone so his legs were visible, and that the woman who had approached his car believed he had no pants on, but she never said she saw his penis. With respect to the indecency involving juvenile(s),[1] Turpin

---

[1] Det. Songer testified that two teenagers were involved in this incident; Turpin referred to only one girl.

stated that he did not know the girl was a juvenile because she was on the street and not in school during the school day. He said that they had kissed and that she had given him a "hand job" through the window of his car; he denied that he had exposed himself to her. "There was no one else around, we started kissing and I was wearing them easy access pants and one thing led to another."

{¶ 44} Turpin acknowledged that he was convicted on attempted rape of his girlfriend's sister as part of a plea agreement, but he disputed, very generally, the events that led to his conviction. He also stated that he completed a sex offender treatment in prison.

{¶ 45} With respect to H.H.'s allegations, Turpin testified that it "did not happen," but that she may have been told that it did over the years. He admitted that he had been investigated for these allegations in 2005. Turpin believed that H.H.'s mother "put her up to" making those allegations and that she was repeating what she had been told, rather than "lying on purpose." Turpin also testified that his mother had died in 2003, so H.H. could not have been in his mother's bathroom in 2005. He denied that he had attempted to rape C.K.; he asserted that their encounter was consensual, that he had not realized she was underage, and that he was "misrepresented" by his attorney, who was later disbarred.

{¶ 46} The trial court found beyond a reasonable doubt that Turpin was a sexually violent predator. In reaching this conclusion, the court expressly relied on Turpin's prior attempted rape conviction, the convictions in the current case, and Turpin's failure to comply with the requirements imposed on him in the past as a sexual offender. It also found that Turpin's sexually motivated offenses have increased in severity over the years

and provided a detailed recitation of these offenses. Based on the evidence presented, the trial court did not create a manifest miscarriage of justice or clearly lose its way in concluding that Turpin was a sexually violent predator.

{¶ 47} The second assignment of error is overruled.

### III. Improper Testimony of Another Alleged Child Victim

{¶ 48} In his first assignment of error, Turpin argues that the trial court erred in allowing Turpin's daughter, H.H., to testify regarding a sexual offense that he allegedly committed against her many years earlier, when she was a young child. He also claims that, because the statute of limitations on any offenses against H.H. had not yet tolled at the time of trial, he was "compelled to be a witness against himself," i.e., to contradict H.H.'s testimony by his own testimony, in violation of his Fifth Amendment rights.

{¶ 49} After initially expressing some reservations about allowing H.H.'s testimony, the trial court concluded that R.C. 2971.01 required it to allow this evidence. Specifically, the trial court found that H.H.'s testimony was relevant to two factors set forth under R.C. 2971.01(H)(2): evidence that suggests that the person chronically commits offenses with a sexual motivation, and any other relevant evidence. The court found that it was "not [its] place to close a door that the legislature clearly intended by the language of the statute to be open."

{¶ 50} The trial court correctly observed that the language of R.C. 2971.01(H)(2)(c), which permits a court to consider "[a]vailable information or evidence [that] suggests that the person chronically commits offenses with a sexual motivation," permits evidence about prior offenses, as does the nature of the specification more generally. The trial court's finding that Turpin was a sexually violent predator was based

on a substantial number of prior offenses, not only the offense against H.H. Moreover, particularly when the trial court is the trier of fact, we presume that the judge reasonably accounts for the age of a child witness, the passage of time, and other such factors in determining the weight to be given to the child's testimony. *See, e.g., State v. Brodie*, 2d Dist. Montgomery No. 20877, 2006-Ohio-37, ¶ 41; *State v. Campbell*, 8th Dist. Cuyahoga Nos. 100246 and 100247, 2014-Ohio-2181, ¶ 16. H.H.'s testimony was not particularly graphic or detailed, and it was highly relevant. The trial court's consideration of H.H.'s testimony, along with significant other evidence, in concluding that Turpin was a sexually violent predator, was not improper.

{¶ 51} Turpin's argument that he was "compelled to be a witness against himself" because H.H.'s evidence would have been "fatal" and "doom[ed] his conviction" if he did not, is without merit. In any case, a defendant faces difficult choices in deciding whether to testify in his own defense. The fact that some or all of the State's evidence might be unrebutted if a defendant does not testify does not amount to compulsion in violation of the Fifth Amendment.

{¶ 52} Turpin's due process concerns are speculative at this point. Theoretically, his statements at this trial might be used against him if he were to be prosecuted in the future for his actions toward H.H. However, it is not apparent that any such prosecution was underway. The admissibility of any prior statements of Turpin would be a matter to be addressed by the court in which such proceedings were conducted in the future.

{¶ 53} The first assignment of error is overruled.

## IV.    Conclusion

**{¶ 54}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.

Copies mailed to:

Lynne R. Nothstine
J. Allen Wilmes
Hon. Michael W. Krumholtz