[Cite as *State v. Ali*, 2021-Ohio-4596.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

| | |
|---|---|
| STATE OF OHIO | C.A. No.    29611 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JUBA MOHAMMED ALI | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.    CR 19 04 1328 |

DECISION AND JOURNAL ENTRY

Dated: December 30, 2021

CARR, Judge.

{¶1}   Defendant-Appellant Juba Ali appeals from the judgment of the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}   In April 2019, an indictment was filed charging Ali with one count of rape and one count of gross sexual imposition.  In June 2019, a supplement to the indictment was filed adding a charge of kidnapping.  That same day, a second supplement was filed adding counts four, five, and six:  rape, with a sexually violent predator specification, kidnapping, with a sexual motivation specification, and gross sexual imposition.  All of the counts related to the events of November 23, 2018, when it was alleged that Ali sexually assaulted his then 16-year-old great niece, S.B.

{¶3}   In July 2019, the State filed a notice of its intent to use other acts evidence in support of its case.  The State sought to present the testimony of two women who claimed to

have been previously assaulted by Ali. The State maintained that the prior incidents would be probative of Ali's motive, common scheme or plan, pattern, or modus operandi. Ali objected to the use of the evidence and requested an evidentiary hearing. A hearing was held on the motion. The trial court ultimately concluded that the testimony was admissible for purposes of establishing a common scheme, plan, motive, intent and/or absence of mistake.

{¶4} The matter proceeded to a trial at which the other acts evidence was presented. Prior to the start of the trial, the State moved to dismiss counts one through three and only proceeded on the remaining counts, which were renumbered. Ali elected to have the sexually violent predator specification tried to the trial judge.

{¶5} The jury found Ali guilty of all counts and the trial court found Ali to be a sexually violent predator. The trial court sentenced Ali accordingly. Ali has appealed, raising a single assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ADMITTING INTO EVIDENCE OTHER ACTS EVIDENCE IN VIOLATION OF EVID.R. 403 AND 404(B), AND THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

{¶6} Ali argues in his sole assignment of error that the trial court committed reversible error in admitting the other acts evidence.

{¶7} "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-440, ¶ 22. Evid.R. 404(B) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be

admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

{¶8} "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts. Thus, while evidence showing the defendant's character or propensity to commit crimes or acts is forbidden, evidence of other acts is admissible when the evidence is probative of a separate, nonpropensity-based issue." *Hartman* at ¶ 22. "[I]t is not enough for the proponent of the other-act evidence simply to point to a purpose in the permitted list and assert that the other-act evidence is relevant to it. The rule is concerned not only with the ultimate justification for admitting the evidence but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence. To properly apply the rule, then, courts must scrutinize the proponent's logic to determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences." (Internal quotations and citations omitted.) *Id.* at ¶ 23.

{¶9} "As with all evidence, the threshold question for determining admissibility asks: is the evidence relevant?" *Id.* at ¶ 24. "[I]n Evid.R. 404(B) cases, the inquiry is not whether the other-acts evidence is relevant to the ultimate determination of guilt. Rather, the court must evaluate whether the evidence is relevant to the particular purpose for which it is offered." (Emphasis omitted.) *Id.* at ¶ 26. "The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties." *Id.* at ¶ 27. In addition, "there must be substantial proof that the alleged similar act was committed by the defendant." (Internal quotations and citation omitted.) *Id.* at ¶ 28. Finally, "the trial court must determine whether the proffered evidence—though admissible under Evid.R. 404(B)—is

nevertheless more prejudicial than probative." *Id.* at ¶ 29. "Balancing the risks and benefits of the evidence necessarily involves an exercise of judgment; thus, the trial court's determination should be reviewed for an abuse of discretion." *Id.* at ¶ 30. In order to minimize the risk of unfair prejudice, "a court should explain both the specific purpose for which the evidence may be considered and the rationale for its admission on the record[]" and the court should provide "an appropriate jury instruction geared toward the specific purpose for which the evidence has been admitted * * *." *Id.* at ¶ 34.

{¶10} If other acts evidence is improperly admitted, the error can nonetheless be harmless. *See State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 177. In determining whether an error was harmless under Crim.R. 52(A),

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

(Internal citations omitted.) *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, ¶ 63. As noted by the Supreme Court, "courts may determine prejudice in a number of ways and use language that may differ * * *." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 25. Irrespective of the precise language used, appellate courts must consider two areas upon review: (1) "the impact that the offending evidence had on the verdict[;]" and (2) "the strength of the remaining evidence." *Id.*

## Other Acts Hearing

{¶11} At the hearing on the State's notice of intent to use other acts evidence, the State presented the testimony of three witnesses, A.B., D.S., and Detective Jerry Gachett.

{¶12} A.B. testified that in July 1994, when she was approximately 15 or 16 years old, Ali, who was a friend of someone she knew, asked if she would model some clothes for him. Ali drove her to a house and gave her clothes to try on. Ali did take photos but also started making inappropriate advances and touching her over her clothing. A.B. demanded that Ali take her home. Ali reluctantly agreed to do so. As they were driving, Ali was trying to touch A.B. Then, Ali said there was something wrong with the vehicle, pulled over, and lifted up the hood. He then came over to the passenger side of the vehicle and put his hands up A.B.'s dress and tried to put his fingers in her vagina. A.B. resisted and Ali got back in the vehicle. Ali did not go the correct direction to take her home and continued to try to touch A.B. Ali told A.B. that he could rape her if he wanted to. While the vehicle was on the expressway, A.B. looked out the window and mouthed the words "Help me." A.B. then unlocked the door and jumped out of the vehicle into a grassy area. She was injured in the process. Two women stopped to help her. Ali also stopped and tried to get A.B. back in the vehicle but A.B. stayed with the women. Afterwards, Ali made threats towards A.B.'s mother.

{¶13} D.S. testified that Ali assaulted her in 1997, when she was 17 or 18 years old. Prior to the assault, D.S. had helped Ali with a catering job. The day of the assault, Ali asked D.S. and another woman to help with a catering job. They agreed to do so. Sometime later, he came back and said he only needed D.S. Ali took D.S. to the restaurant. He went inside and when he came back out, he told D.S. that the restaurant did not need them. Ali then asked D.S. to go with him to model some clothing for him, which she had done before for him. During the car ride, she smoked a marijuana joint with Ali. Ali took her to a motel. D.S. felt dizzy and weak. She thought the joint may have been laced with something. Ali gave her clothing to put on. D.S. put the clothes on, and Ali began taking photos. However, he also started touching her

breasts and vagina. D.S. began crying and asked to go home. Ali called her a "crybaby" but eventually agreed to take her home. They stopped at Subway on the way back and then Ali dropped D.S. a short distance away from the house. Afterwards, Ali tried to intimidate D.S.'s mother. He tried to convince her mother that Ali had not done anything wrong.

{¶14} Detective Gachett with the Akron Police Department testified about his investigation into S.B.'s assault. He indicated that S.B., Ali's great niece, reported that Ali had raped her the day after Thanksgiving 2018. At the time, S.B. was 16. S.B. met Ali the day before the assault when he and S.B.'s mother came over for Thanksgiving. At the time, S.B. lived with her grandparents. Ali was talking to the family about a gym, and the next day, he took S.B., S.B.'s friend, and S.B.'s brother there. Ali then dropped off S.B. at her friend's house and took S.B.'s brother home. S.B. called Ali later to pick her up. Ali picked her up and they went to McDonald's to get something to eat. When they returned to S.B.'s house, S.B.'s brother came out and Ali sent him back inside. Ali locked the car and drove away with S.B. still in the car. They stopped somewhere but Ali said there was too much light, so he drove to another area. That area was close enough to S.B.'s house that she could see the back of her house. Ali tied her up and forcibly had sexual intercourse with her. He took her home and told her that he would take her the next day to a store to buy $100 worth of sex toys. He told S.B. that she was beautiful and that she would look good in black lingerie and red lipstick and that she could be a model. S.B.'s grandmother knew something was wrong when S.B. came home and S.B. reported that Ali tried to touch her. A few days later, S.B. had seizures and was taken to the hospital where she disclosed the nature of the assault. Ali also came over to talk to the grandmother after the assault and denied any misconduct.

{¶15} When Detective Gachett interviewed Ali, Ali indicated that all he did was kiss and hug S.B. and that his DNA would only be on her cheek, neck, and arms. Later, Detective Gachett talked to Ali again. During that interview, Ali indicated that S.B. was the aggressor. Ali stated that S.B. unbuttoned her pants, exposed her breasts, and asked Ali if they were "going to do this or what?" She also took his hand and moved it towards her crotch. Ali told Detective Gachett that he thought about it but did not have sex with S.B. Ali stated that, if anything happened, it was consensual.

{¶16} Following the hearing, the trial court issued an entry concluding that the testimony demonstrated similarities between the prior allegations and the current allegations and that the prior acts could be presented for the purpose of proving a common scheme, plan, motive, intent, and/or absence of mistake.

**Trial**

{¶17} Evidence was presented at trial supporting the following narrative. S.B. and her brother came to live with her grandmother ("Grandmother") and grandfather ("Grandfather") when she was four years old due to physical and sexual abuse she suffered while living with her mother and father. S.B.'s mother was not supposed to have contact with S.B. and her brother but S.B.'s mother would occasionally come to Grandmother and Grandfather's house. S.B. had a history of mental health issues including bipolar disorder and ADHD.

{¶18} On Thanksgiving 2018, S.B.'s mother and Ali, S.B.'s great uncle, showed up at Grandmother and Grandfather's house unannounced. The children did not know Ali at all. Ali began showing the family pictures of his gym. The next day, while Grandmother was at her brother's house, Ali came over and picked up S.B. and her brother. They also picked up S.B.'s boyfriend on the way. They spent a short time at the gym. Ali drove them to visit relatives and

then took S.B. and her boyfriend to her boyfriend's house. Ali next dropped off S.B.'s brother at home. Ali told S.B. that, if she needed a ride home, she could call him. Later, S.B. did call Ali and he picked her up. He drove her to McDonald's and then brought her home. When they reached the driveway, S.B.'s brother came out and Ali told him to go back inside because he did not have socks or shoes on and was wearing shorts and it was cold outside. Ali told S.B. he wanted to show her something and pulled out of the driveway. He drove for a little bit and parked in front of a house but said there were too many streetlights and drove to a street closer to her house and parked there.

{¶19} Ali told S.B. that he gave women massages for money and asked if she wanted a massage. She said no. S.B. testified that Ali started touching her and she froze because she was scared. Ali came over to the passenger side of the car, put the seat back, and got on top of her. Ali pushed up her top and took off her pants and underwear. She indicated that Ali touched her vagina and her breast and that he had her touch between his legs. In addition, S.B. testified that Ali's mouth touched her face and breast. A bruise later developed on S.B.'s breast. A photo of the injury was admitted into evidence. Ali tied her hands behind her back with her underwear, turned her on her stomach and penetrated her butt with his penis. Ali turned her over and put his penis in her mouth. He also penetrated her vagina with his penis. S.B. testified that Ali wore a condom during the assault. When he finished, he told her that he was going to make her his queen and that he would take her to a sex toy shop the next day and let her buy whatever she wanted. Ali then dropped her off at home.

{¶20} When S.B. got home she was scared, confused, and tired. S.B.'s brother testified that she was shaking. Grandmother testified that she knew something was wrong as S.B. appeared upset. S.B. had her head down and Grandmother kept asking her what was wrong.

S.B. maintained that she told Grandmother everything that happened, but Grandmother testified that S.B. only told her that Ali touched her.

{¶21} Ali kept calling Grandmother that night and the next day, but Grandmother did not answer. Ali showed up Sunday asking to take the children to a program put on by a pastor. Grandmother said no and told him that S.B. had said that he touched her. Ali told Grandmother that S.B. was probably confused because he hugged and kissed her on the cheek. Then Ali started to cry.

{¶22} S.B. went to school Monday and disclosed the assault to her counselor. She also had a seizure. She was taken to the emergency room but discharged. The next day, S.B. had another seizure and was again taken to the hospital. The seizures were determined to not be true seizures and instead were seizure-like. A physician testified that they were likely due to the stress of S.B.'s childhood and the immediate stress from the events of the prior days. S.B. had never had seizures prior to the assault. While at the hospital, S.B. disclosed the assault. S.B. was then seen by a social worker, Amanda Bright, and a physician. Due to the passage of time, a rape kit was not done. In addition, because of S.B.'s other presenting issues, a vaginal/anal exam was also not done.

{¶23} Ms. Bright's role was to take a history from S.B. to relay it to the doctor and other service providers. Ms. Bright testified that once S.B. started talking, she "provided a very fluid narrative" with "more detail" than typically seen in a first responder interview. S.B. told Ms. Bright that, on November 23, 2018, S.B. was forced to have sex with her great uncle whom she just met. Her great uncle picked S.B. up from her boyfriend's house and drove her to a road that was one street away from her residence. S.B.'s great uncle asked if she wanted a full-body massage and she said no, she wanted to go home. S.B. told Ms. Bright that her great uncle

reached over and locked the door and pulled a cloth from the glove compartment. S.B.'s great uncle tied her hands to the headrest. Her great uncle licked, sucked, and kissed on her neck and breasts. S.B.'s great uncle then unbuttoned her pants and pulled them down and started to rub her vagina over her underwear. Then he placed his fingers in S.B.'s vagina. S.B.'s great uncle also began kissing her and put his tongue in her mouth. S.B.'s great uncle then flipped S.B. onto her stomach, squeezed her butt and put his finger into her anus. S.B.'s great uncle removed her hands from the headrest but kept them tied. He pulled down his pants and placed her hands on his penis. Her great uncle then pushed her face onto his penis, but she would not open her mouth. He retied her hands to the headrest and put her on her stomach and began grinding on her butt. S.B.'s great uncle was about to insert his penis into S.B.'s vagina but realized that she was on her period. He said, "I guess we ain't raising no babies today." He then inserted his penis into S.B.'s anus causing her a lot of pain. He removed his penis and inserted his tongue in her anus. S.B. passed out from the pain and woke up to her great uncle kissing her breast and neck. He pulled her underwear and pants up and told her that he would take her to a sex store the next day and let her pick out whatever she wanted for $100. Her great uncle took her home and told her to tell Grandmother that she was at McDonald's. S.B. got out of the car crying and limping in pain. Grandmother asked her what was wrong and S.B. made a partial disclosure. She told a teacher at school on Monday.

{¶24} On December 20, 2018, S.B. presented to the Children At Risk Evaluation Center ("CARE Center") for an interview and examination. Darla Helmick, a social worker, conducted the interview of S.B., which was recorded and also played for the jury. S.B. was initially talkative in the video but after the questioning turned to the events at issue S.B. became quiet and stated that she had already talked about it so many times before. S.B. also started looking down

and avoiding eye contact. She denied having consensual sexual activity with anyone. S.B. did ultimately discuss the assault. S.B. described meeting Ali on Thanksgiving and going to the gym earlier in the day on Friday with her brother and her boyfriend. She indicated that Ali had another girl with him she thought was his granddaughter. After the gym, S.B. and her boyfriend were dropped off at her boyfriend's house. Later, S.B. called Ali to pick her up. Ali took her to McDonald's. They went inside to order food but ate in the car. Ali drove S.B. home. When they pulled in the driveway, S.B.'s brother came outside, and Ali told him to go inside because he was not dressed for the cold. Ali locked the car doors and drove away with S.B. still in the car. Ali first stopped in a location he described as being too well lit. He then drove to a street closer to S.B.'s home. Ali told S.B. that he had given two women massages and offered to give her one. She said no and asked him to take her home. Ali tied her hands to the back of the seat, pulled her pants down, and pulled her shirt and bra up over her breasts. He pulled his pants down. Ali sucked and bit her on her left breast causing a bruise. He also sucked on her neck and kissed her. Ali put on a condom and put his penis inside her vagina and then inside her butt. S.B. indicated that it felt like she was "being ripped apart." He tried to put his penis in her mouth, but she tried to bite him, and he slapped her. Ali told her she was a beautiful young lady. He told her she was a queen and a supermodel and that he would take her to a sex toy store the next day and she could pick out whatever she wanted for $100. Ali then drove her home and told her tell anyone that asked that they were at McDonald's talking.

{¶25} S.B. was then examined by a physician. It was a head-to-toe exam including an external exam of genitalia. The doctor did not note any abnormal findings during his exam. S.B. indicated that pain to her anal/genital region from the assault was completely or almost

completely resolved. The doctor testified that that area of the body heals quickly and so was not surprised that S.B.'s exam was normal.

{¶26} Detective Gachett from the Akron Police Department was in charge of the investigation. He interviewed Ali twice. In the first shorter interview, Ali admitted only to kissing her on the neck and cheek. The audio recording of the second longer interview was played for the jury. In that interview, Ali claimed that S.B. initiated sex, stating that she put the seat back, raised up her shirt, unbuttoned her pants and asked if they were going to do this. Before she unbuttoned her pants, she took Ali's hand and put it over toward her crotch area. S.B. told Ali that she wanted to know what it felt like. Ali denied having sex with S.B. and said that anything that went on, S.B. initiated it. Ali admitted that he thought for a minute of having sex with her but knew that he could not have sex with his niece. Ali stated that he drove her home when a light came on in a nearby house. Ali thought the allegations came about because Grandmother initiated them, S.B. was covering up that she had sex with someone else, or she thought Ali was going tell others how S.B. behaved. Ali believed that she mistook his statements that he loved her. Ali mentioned that he did ask S.B. if she was sexually active and she said she was not.

{¶27} As part of the investigation, S.B.'s underwear was tested for DNA. First, the underwear was screened for acid phosphatase, which is found in semen, saliva, vaginal secretions, and some bacteria. The test was negative. The crotch, front, and back of the underwear were also swabbed. The swab from the crotch contained no DNA profile foreign to S.B. The back panel swab contained a mixture of DNA; the two major contributors were S.B. and an unknown female. Ali was excluded from those profiles. There was additional male DNA present that was not interpretable. The swab from the front panel included DNA consistent with

S.B.'s profile; Ali was excluded from that interpretable data. Additionally, male DNA was found but it was not interpretable. The evidence was forwarded on for Y-STR DNA testing. Y-STR testing is a type of DNA processing that amplifies only male DNA.

{¶28} In the Y-STR testing, Male DNA was detected on the crotch, the front panel, and the back panel; however, the male DNA detected on the crotch and front panel was not suitable for comparison purposes. From the back panel, a mixture of male DNA was detected. Ali was determined to be inconclusive as a contributor due to the mixture on the sample.

{¶29} Both D.S. and A.B. also testified at trial. Prior to their testimony, the trial court informed the jury that it could only consider the evidence for the purpose of deciding whether it proved Ali's motive, scheme, or plan.

{¶30} A.B. testified at trial that Ali was a friend of a family member. While she asserted that she was 15 or 16 at the time of the incident, it was discovered that she was actually 20 years old. In 1994, Ali asked her to model some clothing for him. He picked her up and took her to a house. He started making her feel uncomfortable coming on to her. A.B. asked to go home. Ali proceeded to take her home but started touching her. Ali acted like something was wrong with the van and pulled over. He came around and started touching her. He put his hands up her dress and was trying to put his finger in her vagina. A.B. told him to stop. He got angry and told her that he could rape her. A.B. asked him to just take her home. He started driving again but was headed away from her home. She was scared and began mouthing the word help at cars going by. While they were on the highway, she unlocked the lock on the door and jumped out of the car into a grassy patch. Some women stopped to help her. Ali contacted her mother after the incident.

{¶31} D.S. testified that she was 17 or 18 at the time, but during the testimony it became clear that she was actually 19 at the time of the assault. In 1997, Ali was an acquaintance of hers. She had done some catering work with him in the past. The day of the incident, Ali came over and asked D.S. and another woman to do a catering job with him. They agreed to do so. However, shortly after, Ali said he only needed D.S. Ali picked up D.S. and took her to the restaurant. He went in, and when he came back out, he told D.S. that the restaurant did not need them anymore. Ali then asked her to do some modeling for him. Ali took her to a motel. On the drive to the motel, D.S. smoked a marijuana joint with Ali. It made her feel very sick and lightheaded. At the motel, Ali did take photos of her. However, then he started touching her inappropriately. He was touching her breasts and vagina. D.S. told him she did not feel good and wanted to go home. Ali started being mean and calling her names and threatening her. Finally, he did drop her off a block or two from her house. After the assault, Ali had an altercation with D.S.'s mother about the incident.

{¶32} At the end of the State's case, the trial court commented that it had admitted the Evid.R. 404(B) evidence, in part, because of the expected similarities between the ages of the witnesses and S.B. Specifically, it was anticipated that the witnesses would be minors and not young adults. The trial court stated that this new evidence did not change its ruling in any way as S.B. and the witnesses were still young women at the time and concluded that there were similarities between the testimony of the witnesses and S.B. The trial court determined that the testimony could be considered for purposes of plan or scheme, absence of mistake, or modus operandi.

{¶33} Ali also testified in his defense. Ali acknowledged going over to Grandmother's house on Thanksgiving and taking the children and S.B.'s boyfriend to see Ali's gym the next

day. Ali also admitted to dropping S.B. and S.B.'s boyfriend off at S.B.'s boyfriend's house and later picking S.B. up after she called to ask him to do so. Ali then took S.B. to McDonald's and drove her home. S.B.'s brother came outside without shoes or a coat. At that time, Ali indicated that S.B. said that she was not ready to go inside yet and that she wanted to spend more time with him. Ali told S.B.'s brother that they would be right back and drove off with S.B. Ali stopped at his girlfriend's house to let her know that he was with S.B. and would not be back that night. Ali then drove around awhile and S.B. asked him to pull over. S.B. told him she wanted to stop for a bit. While they were talking, S.B. asked if Ali really loved her and he replied that he did. S.B. then took his hand in hers and pulled it toward her crotch. Ali moved his hand towards her knee. S.B. again asked if he really loved her and he again said yes. S.B. then leaned back in the seat, unbuttoned the top of her pants, pulled up her shirt, and said, "[W]e going to do this or what?" Initially, Ali thought "Why not?" but then thought to himself, "[A]re you crazy?" He knew he was not going to have sex with his great niece. Ali then told S.B. that they could not do that. Then a light came on, and he told S.B. that someone might see them. S.B. then buttoned her pants and put her shirt down and Ali drove S.B. home in silence. Ali told S.B. that she could tell him anything and that what happened between them was between them and no one would ever know.

{¶34} The next day, Ali went over to Grandmother's house because he had been calling but no one answered. Grandmother told Ali that S.B. said Ali "french kissed" her and rubbed her between her legs. Grandmother also told Ali about the children's history of abuse. Ali then proceeded to accuse Grandmother and Grandfather of not protecting the children and treating them like a paycheck. Grandmother told Ali that Grandmother did not know what S.B. would say when she saw her social worker. This angered Ali and he left.

{¶35} Ali denied tying S.B. up and asserted that his car was too small for him to do what S.B. claimed happened in the front seat. Ali maintained that he did not know how S.B. got a bruise on her breast. Ali denied sexually assaulting D.S. He claimed that they were having an affair and when he broke it off, that was when D.S. raised her allegations. Ali, however, admitted that A.B.'s allegations were true. Ali claimed to be taking drugs at the time to stay awake to finish clothing for a fashion show. Ali himself then described A.B. jumping from the vehicle and rolling down a hill. Ali then apologized for what he did to A.B. Ali indicated that he believed that S.B. was coached to make the allegations she did. Ali asserted that S.B. got his name wrong in the CARE Center video and that evidenced that she was coached by someone.

{¶36} On cross-examination, Ali acknowledged that, with respect to A.B., he was convicted of attempted abduction, and, with respect to D.S., he was convicted of one count of kidnapping and one count of rape.

{¶37} In the jury instruction, the trial court provided the jury with a very broad Evid.R. 404(B) instruction which stated that if the jury found the evidence of other crimes to be true, the jury could consider the evidence "only for the purpose of deciding whether it prove[d] defendant's motive, opportunity, intent of purpose, preparation, plan or modus operandi to commit the offenses charged in this trial, or the identity for the person who committed the offense in this trial. This evidence cannot be considered for any other purpose." *See Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, at ¶ 69-70.

{¶38} On appeal, the State maintains that the evidence was admissible to show absence of mistake or intent. While the trial court referenced absence of mistake as being an acceptable purpose of the evidence during a discussion with the attorneys, the trial court did not instruct the jury that it could be considered for this purpose. As to the other purposes on which the jury was

instructed, this Court is very troubled. Some of our concerns follow. We note that the Supreme Court has stated that when identity is not an issue at trial, other acts evidence demonstrating a modus operandi is not admissible. *See id.* at ¶ 37-39. As to evidence of a common scheme or design, the Supreme Court has concluded that the "evidence should show that the crime being charged and the other acts are part of the same grand design by the defendant." *Id.* at ¶ 46. With respect to motive in sexual assault cases, the Supreme Court has stated that "in most cases of this type, there is no motive beyond that implicit in the commission of the offense itself." *Id.* at ¶ 50. Furthermore, "[i]ntent is an element of most crimes, but it typically is not a material issue for other-acts purposes unless it is genuinely disputed—in most cases, the act speaks for itself. Thus, intent evidence is not admissible when the requisite intent is presumed or inferred from proof of the criminal act itself, or when intent is not in issue at all, such as when the defense theory is that the act never occurred." (Internal quotations and citations omitted.) *Id.* at ¶ 55.

{¶39} Nonetheless, even assuming without deciding that the evidence was inadmissible, this Court determines the admission of the evidence was harmless. In determining whether there is harmless error:

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

(Internal citations omitted.) *Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, at ¶ 63. Thus, this Court must consider "the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶33. While Ali attempts to characterize this matter as turning solely on the credibility of S.B. and Ali, we determine there was significant evidence presented which

warrants the conclusion that the other acts evidence did not impact the verdict, was harmless beyond a reasonable doubt, and the remaining evidence establishes Ali's guilt beyond a reasonable doubt. *See id.*

{¶40} First, we note that S.B.'s testimony was supported by other evidence. S.B. claimed that Ali bit her breast and there was photographic evidence presented of a significant bruise on her breast taken several days after the assault when she was admitted to the hospital for seizures. Ali had no explanation for how S.B. received that injury. After S.B. was assaulted, both S.B.'s brother and Grandmother noticed something was wrong with her. S.B.'s brother observed that S.B. was shaking when she came home, and Grandmother testified that she knew S.B. was upset. Grandmother described that S.B. was looking down and would not make eye contact. In addition, S.B., who had never had seizures before in her life, days after the assault, began having what was determined to be seizure-like activity. It was believed to be caused by stress.

{¶41} The jury was also able to see S.B. testify at trial and view the video of her interview at the CARE Center. While this Court cannot view her trial testimony, it is evident from the transcript that, at one point during her testimony, she needed to take a break. It appears that there was a concern for S.B.'s well-being at the time because the trial court asked if S.B. was "doing okay." Further, the CARE Center video depicts a quiet teenager who was reluctant to talk about what happened to her. This is at odds with how Ali described S.B. on the day of the assault. Ali incredibly claimed that S.B., his sixteen-year-old great niece came on to him, exposed herself, and basically asked Ali, her uncle who was decades older, to have sex with her.

{¶42} Further, this Court notes that Ali opted to testify in his own defense. During his testimony, Ali spent a fair amount of time discussing his version of the other acts evidence. He

testified that D.S. lied and that A.B. told the truth. He also apologized to A.B. and described her rolling down the hill when she jumped out of his vehicle. Accordingly, the other acts evidence did not only come in through the State's case. *See State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, ¶ 3, 43, 48 ("[W]e conclude that the evidence of the assault on Angelo was harmless and that Cassano's substantial rights were not prejudiced. At trial, Cassano testified that he had been in over one hundred fights in prison and had stabbed four people. Thus, the jury would have known about Cassano's criminal behavior."). Finally, even absent the presentation of other acts testimony, "Evid.R. 609(A)(2) allows the state to impeach the accused's credibility with evidence that the accused was convicted of an offense punishable by imprisonment in excess of one year and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 132. "Generally, a prosecutor can cross-examine as to the name of the crime, the time and place of conviction, and sometimes the punishment. However, details such as the victim's name and the aggravating circumstances are not permissible." (Internal quotations and citations omitted.) *Id.* Here, on cross-examination, the State, with no objection from Ali's counsel, asked Ali about the nature of his prior convictions. *See Cassano* at ¶ 48; *State v. Braun*, 8th Dist. Cuyahoga No. 91131, 2009-Ohio-4875, ¶ 103. Accordingly, the fact of Ali's convictions connected to the other acts testimony would have been admitted even if the trial court excluded the testimony of the other acts witnesses. Thus, the jury would have learned that Ali was previously convicted of attempted abduction on one occasion and kidnapping and rape on another occasion.

{¶43} Moreover, Ali was not forced to testify. *See State v. Hawn*, 138 Ohio App.3d 449, 468 (2d Dist.2000) (noting that while the defendant's testimony may have been "desirable

or necessary" to lessen the impact of the admission of improperly admitted evidence, the testimony "was nevertheless not compelled in the constitutional sense or otherwise derived from the illegality of the improperly admitted evidence[]") (Emphasis omitted.).  The notion that Ali may have chosen not to testify if the other acts evidence had not been admitted is speculative. *See State v. Turpin*, 2d Dist. Montgomery No. 27064, 2017-Ohio-4200, ¶ 51.  The record makes it clear that he made the decision to testify early on in the trial.  During opening statements, Ali's counsel told the jury, "[Ali], you will hear from him.  There's no question [Ali] will take the stand because he wants to tell his story.  He wants to explain exactly what did occur with [S.B.] in the car."

{¶44}  "In any case, a defendant faces difficult choices in deciding whether to testify in his own defense." *Id.*  "The fact that some or all of the State's evidence might be unrebutted if a defendant does not testify does not amount to compulsion in violation of the Fifth Amendment." *Id.*

{¶45}  Given all of the foregoing, we can only conclude that, even if the other acts testimony was inadmissible, the admission of that was nevertheless harmless under the circumstances of this particular case.  Accordingly, Ali's assignment of error is overruled.

III.

{¶46}  Ali's assignment of error is overruled.  The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

CALLAHAN, J.
CONCURS IN JUDGMENT ONLY.

HENSAL, P. J.
DISSENTING.

{¶47} I respectfully dissent because I disagree with the lead opinion's conclusion that any error in the trial court's admission of the other-acts evidence was harmless. The Ohio Supreme Court has specifically addressed the harmless-error standard applicable to the erroneous admission of other-acts evidence. In *State v. Tench*, it stated that an "[e]rror in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction." 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 177, quoting *State v. Lytle*, 48 Ohio St.2d 391 (1976), paragraph three of the syllabus. It also stated that "an

improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming." (Alteration omitted.) *Id.*, quoting *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 32.

{¶48} The lead opinion does not use the standard specified in *Tench*. Instead, it applies a more general harmless-error standard set forth in *State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, which is not an other-acts case, and concludes that the "significant evidence presented" warrants a finding of harmless error. Respectfully, that is not the standard this Court is required to apply. *State v. Culgan*, 9th Dist. Medina No. 09CA0060-M, 2010-Ohio-2992, ¶ 15 ("[T]his Court is bound by the precedent of the Supreme Court of Ohio."). Moreover, while the lead opinion cites the Ohio Supreme Court's precedent in *State v. Morris* for the proposition that the language courts use in conducting a prejudice analysis may differ, that case expressly acknowledges that the "overwhelming" standard applies in other-acts cases. *Morris* at ¶ 32 ("[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming.").

{¶49} Here, I would first conclude that the trial court erred by admitting the testimony of A.B. and D.S. because it was not admitted for a proper purpose under Evidence Rule 404(B). *See State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 20-34 (explaining permissible uses of other-acts evidence). Evidence Rule 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* "The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law[,]" which this Court reviews de novo. *Hartman* at ¶ 22.

{¶50} As the lead opinion points out, prior to trial, the State filed a notice of intent to use other-acts evidence. The State maintained that the prior incidents would be probative of Ali's motive, common scheme or plan, pattern, or modus operandi. After a hearing on the matter, the trial court concluded that the testimony was admissible for the purpose of establishing a common scheme, plan, motive, intent and/or absence of mistake.

{¶51} At trial, prior to the testimony of A.B. and D.S., the trial court held a sidebar discussion with the State and defense counsel regarding the admissibility of the other-acts evidence. Both sides presented their arguments again, and the trial court determined that the other-acts evidence was admissible because it found that there were "enough similarities between the modus operandi in those two prior cases[.]" Then, immediately prior to the testimony of A.B. and D.S., the trial court informed the jury that it could "consider that evidence only for the purpose of deciding whether it proves the defendant's motive and/or scheme or plan in this trial."

{¶52} At the end of the State's case-in-chief, the trial court commented that, when it previously ruled on the admissibility of the other-acts evidence, it had anticipated that the other-acts witnesses would testify that they, like S.B., were minors at the time of the alleged offenses. During the testimony of A.B. and D.S., however, it was revealed that those women were over the age of 18 at the time of the alleged offenses. The trial court indicated that these revelations did not change its ruling on the admissibility of the other-acts evidence because the other-acts witnesses were still between the ages of 16 and 20, and "there were significant similarities between those victims' testimony * * * and the testimony of the victim to show that there are sufficient similarities and that there are certain idiosyncrasies that were the same." It, therefore, concluded that the other-acts testimony could be considered for the purpose of proving a plan or scheme, the absence of mistake, or modus operandi.

{¶53} During closing arguments, the State argued that the other-acts evidence could be considered for the purpose of establishing Ali's motive or modus operandi. It argued that this evidence "does go to * * * the modus operandi [Ali] had with all three of these women. He knows them slightly. He gets them in a car. He takes them somewhere where they don't expect to be, all for the purposes of sexual gratification."

{¶54} The trial court ultimately instructed the jury that it could consider the other-acts evidence for the "purpose of deciding whether it proves Defendant's motive, opportunity, intent of purpose, preparation, plan, or modus operandi to commit the offenses charged in this trial, or the identity for the person who committed the offense in this trial." This broad instruction was inconsistent with the trial court's prior pronouncements regarding the purposes for which the jury could consider the other-acts evidence. It was also far broader than the purposes for which the State ultimately argued it could be used. Nonetheless, applying the Ohio Supreme Court's recent precedent on this issue, I would conclude that none of the exceptions contained in the trial court's jury instruction apply in this case. *See Hartman*, 2020-Ohio-4440, at ¶ 20-34 (explaining permissible uses of other-acts evidence); *State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 37 ("In *Hartman*, we provided a guide for courts to evaluate proposed other-acts evidence to determine whether the evidence connects to a permissible purpose without relying on any improper character inferences.").

{¶55} *Motive*. "Motive evidence establishes that the accused had a specific reason to commit a crime." *Hartman* at ¶ 48. As the lead opinion points out, the Ohio Supreme Court has stated that, in most sexual assault cases, "there is no motive beyond that implicit in the commission of the offense itself." *Id.* at ¶ 50. Moreover, Ali denied having sex with S.B. Ali's motive, therefore, was not an issue in dispute at trial. *See State v. Brogan*, 1st Dist. Hamilton

No. C-070835, 2008-Ohio-5382, ¶ 9 (addressing other-acts evidence and explaining that motive is not an issue when the defendant denies that the charged offense occurred); *Hartman* at ¶ 27, quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988) ("The nonpropensity purpose for which the evidence is offered must go to a 'material' issue that is actually in dispute between the parties.").

{¶56} *Opportunity*. Ali did not dispute that he was in the car with S.B. when the alleged incident occurred. There was, therefore, no dispute as to whether Ali had the opportunity to commit the alleged offenses.

{¶57} *Intent*. "Intent is an element of most crimes, but it typically is not a material issue for other-acts purposes unless it is genuinely disputed—in most cases, 'the act speaks for itself.'" *Hartman* ¶ at 55. Additionally, intent evidence is not admissible "when the defense theory is that the act never occurred." *Id.* Ali maintained that he did not have sex with S.B. Ali's intent, therefore, was not an issue in dispute at trial. *Id.* at ¶ 27.

{¶58} *Plan and Preparation*. "Common-plan evidence generally concerns events that are 'inextricably related' to the crime charged." *Id.* at ¶ 41. "The other acts form the 'immediate background' of the present crime: they are typically either part of the 'same transaction' as the crime for which the defendant is on trial or they are part of 'a sequence of events' leading up to the commission of the crime in question." *Id.* For example, the prior theft of a gun used in the commission of a murder. *See id.* at ¶ 42 ("A defendant's plan might be demonstrated through evidence of 'prior preparatory acts,' such as the prior theft of an instrumentality used in the commission of the current crime."). Preparation is similarly analyzed. *See, e.g.*, *State v. Morris*, 9th Dist. Medina No. 09CA0022-M, 2012-Ohio-6151, ¶ 30 ("[E]vidence that a defendant had

stolen a gun the day before using it to shoot his neighbor would be relevant to prove preparation for murder even though the defendant was not charged with theft.").

{¶59} Here, the other-acts evidence occurred in the 1990s, while the incident with S.B. occurred in 2018. Those other acts did not form the "immediate background" of the underlying incident, nor were they part of a "sequence of events" leading up to the alleged offense in this case. *Compare Hartman* at ¶ 46 ("There may be instances in which seemingly unrelated but highly similar crimes could be evidence of a common scheme to commit the charged crime— perhaps, for instance, a string of robberies occurring close in time and location. We stress, however, that plan evidence should show that the crime being charged and the other acts are part of the same grand design by the defendant."). Without a direct connection between these events, evidence that Ali had a design to sexually assault young women "is tantamount to saying he had a disposition to do so." *Smith*, 2020-Ohio-4441, at ¶ 41.

{¶60} *Modus Operandi and Identity.* "Evidence of modus operandi is relevant to prove identity[.]" *Hartman* at ¶ 37. Here, Ali's identity was not in dispute, rendering the other-acts evidence inadmissible for that purpose. *Id.* at ¶ 37, 39.

{¶61} As the Ohio Supreme Court has stated, when considering other-acts evidence, "[t]he key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *Id.* at ¶ 22. In this case, it did not. The testimony of A.B. and D.S. proved that Ali is the type of person who drives young women – whom he at least casually knows – somewhere, isolates them, and then sexually assaults them. This "behavioral fingerprint" evidence was inadmissible under the facts of this case, and the trial court erred by admitting it. *See id.* at ¶ 37-39; *Smith*, 2020-Ohio-4441, at ¶ 40, quoting *Hartman* at ¶ 46 ("[P]roof that the

accused has committed similar crimes is no different than proof that the accused has a propensity for committing that type of crime.").

**{¶62}** Having determined that the trial court erred by admitting the other-acts evidence, I would next conclude that the trial court's error was not harmless under *Tench*. To that end, I cannot say that there was "no reasonable possibility" that the testimony from A.B. and D.S. contributed to Mr. Ali's conviction, or that, after removing that evidence, the remaining evidence was "overwhelming." *Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205 at ¶ 177, quoting *Lytle*, 48 Ohio St.2d 391 at paragraph three of the syllabus and *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, ¶ 32.

**{¶63}** In support of its conclusion that any error in admitting the other-acts evidence was harmless, the lead opinion cites other evidence presented at trial that bolstered S.B.'s credibility and/or corroborated her version of the events. For example, the lead opinion points to the photograph of an injury to S.B.'s breast, the testimony of S.B.'s brother and Grandmother who noticed that "something was wrong" with S.B., and S.B.'s seizure-like activity that occurred after the incident, which was believed to be caused by stress. The lead opinion also cites the video of S.B.'s interview at the CARE Center, as well as the trial transcript, which contains language indicating that there was a concern for S.B.'s well-being during her testimony. While the State certainly did not present a weak case, I cannot say that this evidence was "overwhelming" proof of Ali's guilt, rendering any error in the admission of the other-acts evidence harmless.

**{¶64}** In addition to the evidence discussed above, the lead opinion also cites the fact that Ali testified on his own behalf, and "spent a fair amount of time discussing his version of the other acts evidence." The lead opinion relies on this testimony to conclude that "the other acts evidence did not only come in through the State's case." The lead opinion also concludes that,

because Ali chose to testify, the State was able to question him about his prior convictions. It concludes that "the fact of Ali's convictions connected to the other acts testimony would have been admitted even if the trial court excluded the testimony of the other acts witnesses."

{¶65} I am troubled by any reliance on Ali's testimony to support a harmless-error analysis. The lead opinion points out that Ali's counsel indicated during opening statements that Ali wanted to testify to explain what occurred between him and S.B. But had the other-acts evidence not been admitted during the State's case-in-chief, Ali may have ultimately decided not to testify. Regardless, assuming that Ali would have chosen to testify even without the admission of the other-acts testimony during the State's case-in-chief, the prosecutor would not have been permitted to elicit the amount of detail regarding the prior acts that came through the State's witnesses. The fact of Ali's prior conviction related to the events involving A.B. may have been allowed into evidence, but the factual details involving that conviction would not have been. *See State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 133 ("At trial, the prosecutor extensively questioned [the defendant] about the underlying facts of his [prior] conviction. Such questioning exceeded permissible cross-examination of a defendant about the details of a prior conviction."). While a defendant's choice to testify can "open the door" to the admission of evidence regarding the defendant's prior acts, that door was already opened – and could not be closed – during the State's case-in-chief. *Compare State v. Howard*, 9th Dist. Summit No. 26897, 2014-Ohio-1334, ¶ 8-17 (holding that the trial court did not err by allowing the State to question the defendant about prior acts when the defendant chose to testify).

{¶66} Further undermining a finding of harmless-error is the fact that the trial court did not tailor the other-acts jury instruction to the facts of this case, which could have "mitigate[ed] the prejudicial effect of the other-acts evidence." *Hartman*, 2020-Ohio-4440, at ¶ 72. As the

lead opinion acknowledges, the trial court provided the jury with a very broad Rule 404(B) instruction. While very broad, that instruction did not indicate that the other-acts evidence could be used to show an absence of mistake, which is the position the State takes on appeal. That incongruence is troubling given that Rule 404(B) "is concerned not only with the ultimate justification for admitting the evidence but also 'with the chain of reasoning that supports the non-propensity purpose for admitting the evidence[,]'" requiring courts to "scrutinize the proponent's logic to determine exactly how the evidence connects to a proper purpose without relying on any intermediate improper-character inferences." *Id.* at ¶ 23, quoting *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir.2014). Moreover, as previously noted, the trial court's jury instruction was inconsistent with its prior pronouncements as to the purposes for which the jury could consider the other-acts evidence, and was far broader than the purposes for which the State ultimately argued that the jury could consider it for. In short, the trial court's jury instruction in this case did not mitigate the prejudicial effect of the other-acts evidence, it compounded it.

{¶67} Without question, the allegations in this case are disturbing. Nothing in this dissent should be construed as undermining or overlooking that fact. But courts cannot let the end justify the means. *State v. Gardner,* 135 Ohio St.3d 99, 2012-Ohio-5683, ¶ 24 ("There is always a temptation in criminal cases to let the end justify the means, but as guardians of the Constitution, we must resist that temptation."). The trial court erred in admitting the other-acts evidence, and I cannot say that there was "no reasonable possibility" that the testimony from A.B. and D.S. contributed to Mr. Ali's conviction. *Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205 at ¶ 177, quoting *Lytle*, 48 Ohio St.3d 391 at paragraph three of the syllabus. Nor can I say that, after removing that evidence, the remaining evidence was "overwhelming." *Id.*, quoting *Morris* at ¶ 32. I, therefore, respectfully dissent.

APPEARANCES:

NEIL P. AGARWAL, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.